Case number 23-3178 United States of America v. Jolene Eicher, appellant. Mr. Colburn for the appellant, Ms. Fleming for the appellate. Good morning, counsel. Good morning, your honor. May it please the court, Mary Colburn for the appellant Jolene Eicher. I should note for the court that Ms. Eicher is here today. She's just in the gallery as opposed to a council table. So from my point of view, this case turns on some common principles. I mean, there are four counts that are at issue. Each one is analyzed just a wee bit differently from the others, but there are certain common circumstances which I would submit to the court are of critical importance and in our view dispositive. One has to do with how is what Ms. Eicher did here different from the notion of mere presence? You know, those of us who sort of grew up in the D.C. Superior Court were very familiar with this notion of mere presence. It's virtually never criminalized. And here in particular, I mean, there are requirements of knowledge and specific intent certain instances and so on. And how is what she did different from simply being there, particularly because of a few circumstances? One is she didn't do any of the things that were dispositive in the Rivera case. In Rivera, the defense as I understood it was that the defendant slash appellant was functioning as a journalist. And I believe and there may have been some sort of a subset of the counts here at issue there, but in Rivera, if that had been demonstrably accurate based on the record, my reading of the opinion is that there may very well have been a different result in that case. Is mere presence enough on count one? And that's just trespassing. I don't think it's enough on count one. And I appreciate the question very much. I've been particularly focused on count one really just as a legal issue. There's a knowingness requirement. And so I think that distinguishes the requirements of that count from mere presence. And I should, by the way, note for the court, there's a particular case and I apologize for this. It's not referenced in our briefing. It's just something that I considered when I was writing the brief, decided I should leave it out. But there is a case in the fourth circuit from back in 2005, U.S. versus Bersey, B-U-R-S-E-Y 416 F3rd 301. And there they seem to import. Is that in your brief? I don't think it's in there, Your Honor. I could be here with the government or do a letter of the court. I haven't. So I'll just leave it there. You can discuss it. It's just usually fair if the other side has notice of the case. No, I agree. I've done it myself as a lawyer. Just always didn't want to share it in advance with opposing counsel. I should have. It's entirely my fault. And I don't know that it's necessarily going to be dispositive here. But I just would note that in that case, which it turns on the same count, knowingly remaining in a restricted area, the court appeared to instruct that it had to be willful and that the defendant had to know what they were doing was illegal. Now, none of those instructions appear. The trespass has to be knowing or willful. That may very well be. And I mean, I certainly take the court's point on that. But I mean, if, in fact, it has to be knowing and willful, my suggestion is that there are a couple of factors here that are critically important. One is you've got an area as witnessed by Ms. Eicher at the time, which is in, I mean, and this is a terrible thing, of course, but it's an utter disarray. So given the disarray, given the fact that none of the usual accoutrements of providing security at the U.S. Capitol or other similarly situated buildings are working or operating at the time, you know, fences are down. I mean, how does... Fences are knocked down, strewn around. There are many more police officers than normal. There is no indication that this is a walk on in at your pleasure. And in fact, when she jumps through the window, there is a wall of police officers in riot gears pushing back, directing people out, directing and pushing her right back out. So she had to... And she came in through a broken window. She had to know, or a jury, shall I say, could reasonably find, or a judge find, that she knowingly entered an area where she was not authorized to be. It just, it doesn't seem... That's, that is... ...valuable to me. No, I understand. That is, but that's precisely my issue. The question basically is, given everything that Your Honor just described, and I think all that is totally consistent with the evidence as it was elicited in front of the jury in this case, what if Ms. Eicher is, you know, the person that Mr. Rivera said he was, a journalist? What if she's a Trump-oriented journalist? What if she's an anti... We're here on sufficiency of the evidence. It's not what if. We don't view the evidence in the light most favorable to Ms. Eicher, do we? No, sure. I don't... Your Honor, I don't... Of course, that is the law, but from the perspective of... I don't understand why all these what ifs are relevant under this standard of review. Well, I submit they are relevant. I think from the perspective of whether or not a rational fact finder could decide that the knowingness, the knowingly requirement is satisfied. I think that the hypotheticals I was posing are illustrative. In other words, if they can't be excluded by the evidence as it was elicited in this case, then from our point of view, that means that the evidence cannot have persuaded a rational fact finder of guilt beyond a reasonable doubt. And so if she were any... No, no, I'm sorry. No, go ahead. We don't take the inferences... If there's two possible inferences from the evidence, which I think is your argument, there's an inference that she was just there as an observer or a certain documenter, or that she was there as a participant. Two reasonable inferences from the evidence. At this stage, the jury having convicted, we take the inference in favor of the verdict, not in favor of the defendant. Those are all perfectly fine arguments to make for the jury, but we are not the jury. No, understood. We're taking their verdict and saying, was it irrational? Was it irrational for them to conclude that she was there as a demonstrator? My submission to your honor is... So you have to sort of foreclose at this point for our purposes of arguing at this level, in this court, about a factual determination by the jury. You essentially have to argue that the evidence so overwhelmingly foreclosed any other conclusion that it was irrational for the jury to so find. And that is an extraordinary burden. And I think just saying that, well, it could have been one, could have been the other, does not come close to meeting that burden. I'm not sure, obviously, respectfully, I'm not sure I agree with that formulation, as your honor put it. In other words, if a set of facts is susceptible of a series of different inferences, and if all those inferences are essentially equal, I mean, if one, if there's not any reason to believe the inculpatory inference, as opposed to one of a number of exculpatory inferences, my suggestion to your honor is that that means that the verdict is, to use your honor's term, which of course is the term used in the case law, irrational. I think the evidence can't just be... If evidence, or even three or four pieces of evidence, could be interpreted either way reasonably, then when you add three or four together, it becomes irrational. What's your best case, your best example of a court of appeals reversing a jury verdict under this type of analysis? You know, I apologize, your honor. I don't think I have a case right at my fingertips that falls within the ambit of what your honor just described. But in Rivera, I mean, the way I read that case suggested to me that if the evidence, you know, was susceptible of the conclusion that that defendant had been a journalist, then the result, like I said, would have been different. And here, one of the key facts, which is not really emphasized, and frankly, I wish I had emphasized it more in the briefing, is that the evidence suggested that Ms. Eicher believed that the disturbance at the Capitol was being caused by what she understood to be Antifa. And there is no contrary evidence. There is no evidence contradicting the proposition. The jury doesn't have to believe that, though. Just because there's no contrary evidence doesn't mean that it's taken as true. I agree with that. The jury doesn't have to believe it, but there has to be something that the jury would condition a decision to disbelieve it on. And here, I mean, she made the statement that she thought what was going on at the Capitol was engendered by this entity she knew of as Antifa. And I'm not aware of anything— Why would that change any elements? Well, in terms of whether or not— A lair, unlawfully. She was still surrounded by an issue that she was not supposed to be there. So I'm kind of, I'm struggling to understand, even if she thought, notwithstanding the fact that these people all had Trump signs, Trump hats, Trump bodywear, Trump painted on their body, that they were actually Antifa, what would that matter? For the elements of which— I guess if you can help point me to which element of which count you're talking about that this is relevant to, that would be helpful. It's probably more relevant to two and three. Which aspect of two and three? Well, with respect to if she thought that, I mean, like I said, and I realize this argument doesn't seem to be gaining any traction here, but, you know, if, I mean, if she were— I'm trying to understand it, though. I'm sorry, Your Honor. I don't understand it before. Farron, if she were something other than, you know, what the government said she was, if she were a journalist, if she were, you know, a good Samaritan, if she were a journalist not oriented towards these demonstrators or something like that, if she believed, and like I said, I don't believe there's any contrary evidence, but if she believed that what was happening on the Capitol was engendered by this entity she knew of as Antifa, then I don't think it could possibly be said that she intentionally disrupted anything or that she engaged in disruptive or disorderly conduct. I mean, that would connote the proposition that she, you know, saw a set of Capitol grounds in disarray. She walked onto the Capitol, possibly out of curiosity, possibly for any other reason, an innocuous reason, but if she didn't think that she was part of an entity that was attempting to disrupt the business on the Capitol, then it seems to me, I mean, if there's an absence of evidence of that, and that's my suggestion to the court, she can't be guilty of disruptive or disorderly conduct. We have a lot of precedent that says even one person who's there unlawfully, so even if she wasn't with them, but was in a place where it was clear she was not authorized to be, massive police presence in riot gear, pepper spray, tear gas, things in turmoil, that that is disruptive of the proceedings because they could not resume proceedings. They could not bring the vice president back into the Capitol until it was fully cleared of every single person who was unauthorized to be there. Understood, but I mean, if that rubric were applied, you know, more broadly, I mean, that would criminalize, you know, the mere presence of any human being on the Capitol grounds at that moment in time, anyone. The mere presence of anyone unlawfully there. So it doesn't criminalize the police being there. It doesn't criminalize credentialed press being there. It doesn't criminalize members of Congress and their staff from being there. So if we're there unlawfully. Wouldn't it criminalize credentialed press? I mean, if credentialed... Unlawfully. I mean, then just to sort of take your honor's point, if they don't go through a metal detector or through the usual security screening apparatus, they're there unlawfully. I mean, it seems to me, I know I'm over my time. Oh, that's okay. My council colleagues have any more questions? Okay. So I think now I understand your point. Thank you. I'm grateful for that. We will give you a little time on rebuttal. Okay. Appreciate it. Good morning and may it please the court. Mary Fleming representing the United States. Ms. Eicher cannot meet her high burden to show that no rational jury could convict on the four counts against her. To start with the question of how is this different from your presence, Ms. Eicher was first of all, on the front lines of the West Plaza, where she was face to face with police officers in the thick of the violence. She persisted all the way to the terrace up into the Capitol, as Judge Millett noted, through a broken window where she was met with lines of police officers. And her own words show that she wasn't supposed to be there. She recognized that people were getting arrested and that she held the line. And what in the video evidence or other evidence that you have shows that when she came into the Capitol through the window, there was a stream of people coming in. It was not a novel idea on her part. She's just there for a couple of minutes, just kind of looks around and then moves on out with the crowd. What is your, how do you interpret that to support a jury verdict that she actually was parading or demonstrating? So we would point to this court's decision, which held that demonstrating can include gathering to express support for an identified viewpoint that when Ms. Eicher entered the Capitol, there were rioters chanting, fight for Trump in whose house? Our house. She took a picture holding a Trump sign. She went to the Stop the Seal rally. So from that, I'm trying to say inside the Capitol. So I get your argument that she was part of demonstration outside the Capitol, but for three minutes or so, she was inside the Capitol. It's how do you, when you look at it, at least as I saw it, she comes in, kind of looks around, some guys screaming and yelling around her and she kind of backs off. She just seems to look around, maybe take a picture and walk out. I don't see her chanting. I don't see evidence, at least I could be wrong if you think if there's a race, the jury could have found that chanting, posing up with people who are demonstrating more loudly. So what is the theory for demonstrating inside the Capitol? So that doesn't deal with the. Sure. So the evidence of outside the Capitol is just is relevant to show that Ms. Eicher was joining the crowd to support the viewpoint that they were clearly advocating for. You're correct that there is no evidence that she chanted inside the Capitol, but under Nassif, this court held that pretty similar facts inside the Capitol where the defendant didn't chant. As far as I remember, this court held that Nassif was demonstrating when he joined a group of hundreds of people, many carrying signs, banners or flags who shouted and chanted as they descended on and entered the Capitol seeking to halt the certification. So I'm trying to I'm not being clear on my question. There's there's a cluster of people who are sort of standing there chanting and yelling inside the Capitol. Don't we need some evidence that she joined that group as opposed to kind of walked around them and went out? I think by entering the Capitol and while other unauthorized persons were doing that, that is joining the group and adding her her support to it. And I think that's pretty similar to the facts of Nassif. I just wanted to ask you about the. Good guys prevailed. Sure. Comment at close closing.  So opening. I think it was closing, right? It was closing. That's not summing up evidence. That is, as I hear it, when I hear words like good guys, that means there's good guys and then there must be bad guys and the defendant must be part of the bad guys. When you say the good guys prevailed, you're us them. The prosecutor is us them between the jury and the defendant. That's not summarizing evidence. That seems to me completely improper. And in a case like this, explain to me why it was not prejudicial when sort of the very question that I was just asking about what happened inside the Capitol was, was she associated? The jury was going to have to find was, was she associated with that demonstration when she went inside the Capitol or did she just kind of look to see what was going on and leave? And if you tell the jury sort of poison the well by saying this is us them, she's part of them. Haven't you improperly prejudiced the jury's consideration of that very important question, at least on the account for. So a couple of things, Your Honor. It was clear from the context that the prosecutor was talking about officers who were trying to prevent an incursion into the Capitol. And the point was that Miss Iker's culpability was not lessened because the police were ultimately successful in that effort. No, it's not. This is Supplemental Appendix 29 where you have this. Now, in the end, the good guys prevailed. And the very next words are Miss Iker and the other rioter were eventually removed, right? So she's the bad guys and she's collective with these other rioters. And so she's not, we know who they think the good guys are, but the problem is you're labeling somebody bad guys and you're asking the jury to make a verdict based on an us them categorization that is not a labeling that is not based in evidence when, in fact, it is actually one of the very questions before the jury is was she part of them inside the Capitol? So I'll point this to Gartman where the prosecutor's comment about the defendant being bad was not error. Also, the defense didn't seem to contest that this event was. I'm talking about dividing the courtroom into us and them and then also putting her with them in a case where that is just really uncount for. That seems to be very much the central question. There's no dispute. She was inside the Capitol. There's video evidence of that. It really, her argument is I wasn't, I didn't go in there as part of the demonstration. That's why I was only in there for a couple of minutes. And so them putting her in the them group as opposed to us, which is probably not just Capitol Police, but prosecutors and jurors. Doesn't it, again, poison the well on that? So first, the jury was instructed on that to disregard that or that the arguments of counsel are not evidence and that the jurors are the sole finders of the fact. I think this strong objection. It didn't. It didn't draw an objection. This is plain error. And I think the fact that it didn't draw an objection and a very experienced trial judge. But your brief, your, your, your briefing was this comment was just sort of an assembly of evidence. And this is not. I understand you said that for some of the horrible and tragic comments, but this one's not. OK, well, a complete labeling and categorization. If you're if your honor disagrees and thinks that that comment was improper, that it was if your comment, then we would argue that there was no substantive prejudice. Are you I mean, are you are you're arguing that it's not even error to us them? Yes, that's that's correct. We don't think it was error in light of the fact. What's your what's your best case that you're allowed to us them when the central one of the central issues on one of the counts is whether the defendant was part of them? Well, I would point again to this to this court's decision, Iker, where a comment that the defendant was bad was not error. And that's different. Like bad behavior is different from this is an associational one when association is a  If you're again, if you have a case where. An associational argument, not specifically, but this court's repeatedly held that the government is allowed to make hard hitting, closing arguments and that we're not us them is one inference and one way to view that comment. But under Donnelly. How do you review good guys, bad guys? I don't think about good guys, bad guys. The prosecutor goes on to say that the good guys prevailed, but that fact doesn't mean that Miss Iker's culpability is lessened. Could this be interpreted not to mean us them, including the jury when the victims in this case included police officers. So then it's not us, including the jury. It's just the good guys, the law enforcement officers, the police officers versus the rioters. So it doesn't draw the jury into the suggestion. Yes, that's exactly what the prosecutor was trying to convey. And under Donnelly and Monaghan and other decisions by this court, we don't assume that the jury is going to take the worst inference from from the comment. And again, next word is the very next words are Miss Iker and the rioters. Very next words again. And Miss Iker and the rioters were removed from the building and the grounds, and that doesn't lessen her culpability. So that was the point that the prosecutor was trying to make. And we we assume that the jury can use their logic and common sense to understand it that way. And again, the jury was instructed. This was a very small part of the argument. The jury was instructed. The arguments are not evidence. And no one no one, again, was disputing that January six was a negative event. If this court has no further questions, we'd rest on the briefs on the other issues. Thank you very much. Thank you. Okay, Mr. Coburn, we'll give you two minutes. Thank you so much. And with the court's permission, I would just devote myself, you know, the two minutes I have to the question of the government's opening and closing. And, you know, of course, look, it's understandable that anyone trying a case like this, I mean, could feel, you know, the heat that it could become overheated. I understand that's just a matter of human nature. But to pick up on your honor's point about this being an associational argument, I just don't see the proposition that we're talking about somebody else, you know, that it's somehow limited just to law enforcement and law enforcement prevailed. And that's not us. That is, from my point of view, I just would tell you tell the court, I think that's just totally irreconcilable with the way this case was argued. I mean, we're talking here about and just to state the obvious, you know, about an event on January 6th, 2021, which is, I mean, it has preoccupied, you know, the nation's attention for years. It's one of the most inflammatory events of a political nature in the history of this country. And, you know, the notion that a prosecutor could make what I would suggest to the court is a plainly, unambiguously associational argument here and could not just say, you know, what was referenced. There was no objection. Correct, your honor. There was no objection. I think that's unfortunate. For all I know, it may have been a tactical decision on the part of the trial law. But that just means that you have to overcome the plain error standard, which is difficult. Not only does it have to be plain, but you have to show prejudice, financial rights, and all the other things. Agreed. I mean, I'm not disputing for one moment that it's a plain error analysis. Here, it seems to me unambiguously the case. It turns on, and here I'm referring to the Becton case, a 2010 case from this court. The closeness of the case, the centrality of the issue affected by the error, the steps taken to mitigate the errors effects, which were none. I mean, and certainly I'm not sort of, you know, blaming the trial judge. It's just a question of the fact that there unfortunately was no objection. But here, the nature of the argument, I mean, the inflammatory quality of it, you know, the fact that, I mean, because it's not just the good guys prevailed, but it was a horrible day in the history of this country. Ms. Eicher, which I think may address the point that was being made earlier, it's explicitly stated by the government, Ms. Eicher helped to make that horrible day possible. Terrifying, horrible, tragic, but the good guys prevailed. When all that verbiage is taken as a whole, I just don't think there can be any question that this is a patently associational argument. It is really sort of an ad hominem kind of a thing that's encouraging the jury to detest personally the defendant. And I mean, it seems to me that that's, you know, well over the plain error threshold. And I'm thinking in particular about, for example, the Katala case, a 2022 case from this court in which there was an appeal to nationalism. Here, we're talking about something that's far more inflammatory than an appeal to nationalism. Thank you. Does my colleagues have any further questions? Thank you very much. Mr. Colburn, you were appointed by this court to represent Ms. Eicher in this case. I'm very grateful for your assistance. I'm very grateful to have been involved. Thank you very much. The case is submitted.
judges: Millett; Katsas; Pan